UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| ERIN LAUX, | CASE NO. 1:17CV1098 |
| Plaintiff, | |
| v. | MAGISTRATE JUDGE GEORGE J. LIMBERT |
| NANCY A. BERRYHILL[1], ACTING COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | MEMORANDUM OPINION & ORDER |
| Defendant. | |

Plaintiff Erin Laux ("Plaintiff") requests judicial review of the final decision of the Commissioner of Social Security Administration ("Defendant") denying her application for Disability Insurance Benefits ("DIB"). ECF Dkt. #1. In her brief on the merits, Plaintiff asserts that the administrative law judge ("ALJ") erred by failing to find that her chronic migraines were not severe impairments and he violated the treating physician rule concerning the opinions of her treating neurologists, Drs. Pillai and Tesar. ECF Dkt. #15. For the following reasons, the Court AFFIRMS the decision of the ALJ and DISMISSES Plaintiff's case in its entirety WITH PREJUDICE.

## I.   **FACTUAL AND PROCEDURAL HISTORY**

Plaintiff filed an application for DIB alleging disability beginning December 8, 2013 due to brain surgery, a blood clot in her brain, and a prior history of seizures. ECF Dkt. #11 ("Tr.") at 143-147, 191.[2] The Social Security Administration ("SSA") denied her application initially and upon reconsideration. *Id.* at 69-107. Plaintiff requested a hearing before an ALJ, which was held on February 11, 2016. *Id.* at 35, 107.

---

[1] On January 20, 2017, Nancy A. Berryhill became the acting Commissioner of Social Security, replacing Carolyn W. Colvin.

[2] All citations to the Transcript refer to the page numbers assigned when the Transcript was filed in the CM/ECF system rather than when the Transcript was compiled. This allows the Court and the parties to easily reference the Transcript as the page numbers of the .PDF file containing the Transcript correspond to the page numbers assigned when the Transcript was filed in the CM/ECF system.

On April 27, 2016, the ALJ issued a decision denying Plaintiff's application for DIB. Tr. at 14-28. On May 25, 2017, Plaintiff filed the instant suit seeking review of the ALJ's decision. ECF Dkt. #1. She filed a brief on the merits on September 25, 2017 and Defendant filed her merits brief on October 25, 2017. ECF Dkt. #s 15, 16.

## II.     **SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**

In his April 27, 2016 decision, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her application filing date, and he found that since that date, Plaintiff had the severe impairments of: seizure disorder; mild cognitive impairment with aphasia; and depressive disorder. Tr. at 19. He found that Plaintiff's impairments of chronic migraines, urinary incontinence, anxiety with panic attacks, and obesity were not severe impairments. *Id*. at 19-20.

The ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Subpart P, Appendix 1. Tr. at 20. After considering the record, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform work at all exertional levels with the following limitations: never climbing ladders, ropes or scaffolds; avoidance of commercial driving, operating dangerous machinery, or working at unprotected heights; understanding, remembering, and carrying out simple instructions, but with reminders for more complex instructions; maintaining persistence and pace for short tasks; a low stress work environment not requiring frequent changes; only superficial, occasional interaction with others, which superficial means no work requiring arbitration, negotiation, or conflict resolution, no management or supervision of others, and no work where she is responsible for the health, safety, or welfare of others. *Id*. at 22.

Based upon Plaintiff's age, education, work experience, the RFC, and the vocational expert's ("VE") testimony, the ALJ determined that Plaintiff could not perform her past relevant work, but she could perform jobs existing in significant numbers in the national economy, such as the jobs of laundry worker, wire worker, and electronics worker. Tr. at 27-28. In conclusion, the ALJ found that Plaintiff had not been under a disability, as defined in the Social Security Act, and she was not entitled to DIB from December 8, 2013, through the date of his decision. *Id.* at 28.

## III.   STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to social security benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## IV.   STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation omitted). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234 (6th Cir. 2007). Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled. The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001). However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (internal citations omitted).

## V. LAW AND ANALYSIS

### A. STEP TWO NON-SEVERE IMPAIRMENT

Plaintiff first asserts that the ALJ erred by failing to find that her chronic migraines were a severe impairment. ECF Dkt. #15 at 19-21. The Court finds that the ALJ applied the correct legal standards and substantial evidence supports his determination that Plaintiff's chronic migraines were not a severe impairment.

At step two of the sequential steps for evaluating entitlement to social security benefits, a claimant must show that he or she suffers from a severe medically determinable physical or mental impairment. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is not considered severe when it "does not significantly limit [one's] physical or mental ability to do basic work activities." §404.1521(a).

At step two, the term "significantly" is liberally construed in favor of the claimant. The regulations provide that if the claimant's degree of limitation is none or mild, the Commissioner will generally conclude the impairment is not severe, "unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities." 20 C.F.R. §404.1520a(d). The purpose of the second step of the sequential analysis is to enable the Commissioner to screen out "totally groundless claims." *Farris v. Sec'y of HHS*, 773 F.2d 85, 89

(6th Cir.1985). The Sixth Circuit has construed the step two severity regulation as a "*de minimis* hurdle" in the disability determination process. *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir.1988). Under a Social Security policy ruling, if an impairment has "more than a minimal effect" on the claimant's ability to do basic work activities, the ALJ is required to treat it as "severe." SSR 96-3p (July 2, 1996).

Once the ALJ determines that a claimant suffers a severe impairment at step two, the analysis proceeds to step three; any failure to identify other impairments, or combinations of impairments, as severe in step two is harmless error. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir.1987). Once a claimant clears Step Two of the sequential analysis, the ALJ is required to consider all of his or her impairments, severe and non-severe, at every subsequent step of the sequential evaluation process. *See Anthony v. Astrue*, 266 Fed. App'x 451, 457 (6th Cir. 2008)(ALJ's failure to identify an impairment as severe was "legally irrelevant" because the ALJ found other impairments to be severe at Step Two, which allowed the ALJ to consider all impairments in the later steps in the process).

Here, the ALJ evaluated Plaintiff's chronic migraines at Step Two of his decision. Tr. at 19. He noted that while Plaintiff alleged chronic migraines, no objective medical evidence existed which supported more than minimal work-related limitations resulting from the impairment. *Id.* While Plaintiff points to medical evidence supporting a contrary finding, the standard of review for this Court is whether substantial evidence supports the ALJ's determination. *Buxton*, 246 F.3d at 773. As explained below, substantial evidence supports the ALJ's Step Two determination.

In his decision, the ALJ cited to the proper regulations and Social Security Rulings in conjunction with his Step Two findings. Tr. at 18-19. He specifically addressed Plaintiff's chronic migraine headaches. *Id.* at 19. In determining that Plaintiff's chronic migraines were not a severe impairment, the ALJ cited to Plaintiff's testimony concerning the frequency of her migraines at two to three times per week. *Id*. at 19. He also noted her taking of medication, as well as nerve blocks, trigger point injections, and Botox injections. *Id.* He found that these treatments appeared to based more upon Plaintiff's own subjective symptoms rather than objective medical findings and he cited to MRI and CT scan images of Plaintiff's head and brain which showed essentially normal results.

*Id.*, citing Tr. at 310-311, 391. The ALJ additionally cited to the records of Plaintiff's neurologists which indicated that Plaintiff presented with no neurological deficits and modest pain, at most at times, and he cited records indicating that medications were controlling the migraines and therefore the impairment was non-severe. *Id.*, citing Tr. at 265 (follow-up visit with doctor indicating that Plaintiff's headaches are stable), 337 (doctor found upon physical examination that head was normocephalic and Plaintiff had no apparent pain behavior), 371 (Plaintiff indicated that she went to emergency room on May 30, 2014, doctor told her headache was likely a migraine, brain CT showed no abnormalities, and doctor confirmed normal brain CT scan and stable postoperative changes), 404-405 (physical examination showed normocephalic and atraumatic, and doctor noted that CT of the brain dated May 30, 2014 showed no hemorrhage and CT of brain dated June 3, 2014 showed no acute intracranial process), 413 (Headache Center doctor noted that Plaintiff had some improvement in her headaches since she started Topamax, which was increased), 442-443 (Headache Center noted Plaintiff's complaints of headaches and had tenderness, spasms, and trigger points at the neck and suboccipital area, and gave trigger point injections which reduced the pain), 483 (Plaintiff's complaints to Headache Center of headaches and precertification sought for Botox injections), 516 (clinic note indicating that Plaintiff had not been seen in Headache Center for some time and Plaintiff reported that Zonisamide was helping to reduce the frequency of her headaches).

Moreover, even if the ALJ committed error in failing to find that chronic migraine headaches were not a severe impairment, the error was harmless because the ALJ determined that some of Plaintiff's other impairments were severe and he continued on in the disability evaluation process. In *Maziarz*, the Sixth Circuit Court of Appeals held that an ALJ's failure to find one of a claimant's impairments to be severe was not reversible error because the ALJ considered other impairments to be severe and continued onward in the disability evaluation process, where the severe and non-severe impairments could be considered in the remaining steps of the process. 837 F.2d at 244. Similarly here, the ALJ found that Plaintiff's seizure disorder, mild cognitive impairment with aphasia and depressive disorder were severe impairments. Tr. at 19. The ALJ proceeded onward in the disability evaluation process and had the opportunity to consider and considered Plaintiff's chronic migraine headaches in those remaining steps. The ALJ specifically indicates in the RFC

portion of his decision that Plaintiff testified as to having severe headaches every two to three weeks that lasted for several days at a time and she had to go to the emergency room due to the pain. *Id.* at 23. He discounted her allegations of disabling pain and limitations based upon the record evidence that he reviewed of her neurologists and primary care doctors. *Id*. at 19, 23-27. Moreover, no doctor that examined or treated Plaintiff restricted her work-related abilities based upon her migraine headaches. Since the ALJ addressed Plaintiff's chronic migraine headaches, applied the proper standards in determining that Plaintiff's chronic migraines headaches were not a severe impairment, and substantial evidence was presented to support this finding, the Court finds Plaintiff's assertion to be without merit. Moreover, and alternatively, since the ALJ could and did in fact consider Plaintiff's chronic migraine headaches in determining whether Plaintiff had the RFC to perform substantial gainful activities, the Court finds that the ALJ's failure to deem this impairment severe at Step Two does not constitute reversible error. *Maziarz*, 837 F.3d at 244; Tr. at 26-30.

## B.     MEDICAL OPINIONS OF TREATING PHYSICIANS

Plaintiff also asserts that the ALJ erred in the weight that he attributed to the opinions of her treating physicians, Drs. Pillai and Tesar. ECF Dkt. #15 at 16-18. For the following reasons, the Court finds that the ALJ properly evaluated their opinions and substantial evidence supports the ALJ's treatment of those opinions.

A claimant's RFC is an assessment of the most that a claimant "can still do despite [her] limitations." 20 C.F.R. §§ 416.945(a)(1). An ALJ must consider all of a claimant's impairments and symptoms and the extent to which they are consistent with the objective medical evidence. 20 C.F.R. § 416.945(a)(2)(3). The claimant bears the responsibility of providing the evidence used to make a RFC finding. 20 C.F.R. §§ 416.945(a)(3). However, the RFC determination is one reserved for the ALJ. 20 C.F.R. § 416.946(c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed.Appx. 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's [RFC] rests with the ALJ, not a physician."); SSR 96-5p, 1996 WL 374183, at *5. Social Security Ruling ("SSR") 96-8p provides guidance on assessing RFC in social security cases. SSR 96-8p. The Ruling states that the RFC assessment must identify the claimant's functional limitations and restrictions and assess his or her work-related

abilities on a function-by-function basis. *Id*. Further, it states that the RFC assessment must be based on *all* of the relevant evidence in the record, including medical history, medical signs and lab findings, the effects of treatment, daily living activity reports, lay evidence, recorded observations, effects of symptoms, evidence from work attempts, the need for a structured living environment and work evaluations. *Id*.

An ALJ must give controlling weight to the opinion of a treating source if the ALJ finds that the opinion is well-supported by medically acceptable clinical and diagnostic techniques and not inconsistent with the other substantial evidence in the record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). If an ALJ decides to discount or reject a treating physician's opinion, he must provide "good reasons"[3] for doing so. Social Security Rule ("SSR") 96-2p. The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This allows a claimant to understand how his case is determined, especially when he knows that his treating physician has deemed him disabled and he may therefore "be bewildered when told by an administrative bureaucracy that he is not, unless some reason for the agency's decision is supplied." *Wilson,* 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)). Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he or she rejected or discounted the opinions and how those reasons affected the weight afforded to the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243 (citing *Wilson*, 378 F.3d at 544).

The Sixth Circuit has noted that, "while it is true that a lack of compatibility with other record evidence is germane to the weight of a treating physician's opinion, an ALJ cannot simply invoke the criteria set forth in the regulations if doing so would not be 'sufficiently specific' to meet the goals of the 'good reason' rule." *Friend v. Comm'r of Soc. Sec.*, No. 09-3889, 2010 WL

---

[3] The Court notes that the SSA has changed the treating physician rule effective March 27, 2017. *See* 20 C.F.R. § 416.920. The SSA will no longer give any specific evidentiary weight to medical opinions, including affording controlling weight to medical opinions. Rather, the SSA will consider the persuasiveness of medical opinions using the factors specified in their rules and will consider the supportability and consistency factors as the most important factors.

-8-

1725066, at *8 (6th Cir. 2010). The Sixth Circuit has held that an ALJ's failure to identify the reasons for discounting opinions, "and for explaining precisely how those reasons affected the weight" given "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Parks v. Social Sec. Admin.*, No. 09-6437, 2011 WL 867214, at *7 (6th Cir. 2011) (quoting *Rogers*, 486 F.3d at 243 ). However, an ALJ need not discuss every piece of evidence in the administrative record so long as he or she considers all of a claimant's medically determinable impairments and the opinion is supported by substantial evidence. *See* 20 C.F.R. § 404.1545(a)(2); *see also Thacker v. Comm'r of Soc. Sec.*, 99 Fed. App'x 661, 665 (6th Cir. 2004). Substantial evidence can be "less than a preponderance," but must be adequate for a reasonable mind to accept the ALJ's conclusion. *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010) (citation omitted).

On January 29, 2014, Dr. Pillai, Plaintiff's treating neurologist, wrote a letter indicating that he evaluated Plaintiff on January 27, 2014 for her cognitive difficulties and it was his opinion, based upon his neurological evaluation, Plaintiff's brain MRI results, and her previous medical records, that her history of seizures and surgical intervention "plays a role in her cognitive disability and impairs her functional ability to perform in a work place setting." Tr. at 254. He further opined that, "[t]he cognitive difficulties are likely a long term deficit, therefore I support her application for disability benefits." *Id.*

In addressing this opinion, the ALJ noted that Plaintiff's treating physician, Dr. Schaefer, of the Neurology Epilepsy Department at the Cleveland Clinic Foundation, had referred Plaintiff to Dr. Pillai, due to neuropsychological testing results conducted on May 29, 2013 which showed that Plaintiff had a substantial decline since prior testing 8 years ago. Tr. at 23, citing Tr. at 265-267; 353. Dr. Schaefer had examined Plaintiff on January 7, 2014 and noted Plaintiff's complaints of memory problems and word-finding difficulties. *Id.* at 265. She identified Plaintiff's final diagnoses after cortical resection as: left lateral temporal lobe, excision of focal perivascular white matter atrophy, subpial glosis; hippocampus excision, focal gliosis; and amygdala excision, hamartia, focal gliosis. *Id.* at 265-266. Dr. Schaefer found no evidence for postural or action tremor and she noted a normal physical examination. *Id.* at 266. She indicated that Plaintiff's epilepsy

classification was temporal lobe epilepsy on the left with an etiology of mesial temporal sclerosis. *Id.* at 265. She examined Plaintiff and diagnosed her with status-post temporal lobectomy, seizure-free, and she referred Plaintiff to Dr. Pillai due to uncertainty as to why Plaintiff had cognitive decline and whether it was related to the medications to prevent the seizures or whether it was from depression or some other degenerative process. *Id.*

At a January 2014 evaluation, Dr. Pillai noted Plaintiff's history of epilepsy since childhood and her temporal lobectomy on March 10, 2004. Tr. at 268. He reviewed reports of her memory problems that began in 2010 after she had an episode of thrombosis in her brain 2 days after giving birth. *Id.* at 270. Plaintiff told Dr. Pillai that she had word-finding problems since her surgery, which became worse in 2010. *Id.* Based upon a full examination and a review of the prior neuropsychological evaluation, Dr. Pillai diagnosed Plaintiff with a cognitive impairment status-post left temporal lobectomy with recent worsening possibly due to multiple factors, such as sleep, stress and psychological factors. *Id.* at 274. He recommended tasks to improve Plaintiff's memory and attention, and he recommended good sleep hygiene, that Plaintiff learn a new skill, perform cognitive exercises, perform physical exercise and yoga or meditation, stop using alcohol, and that she receive a prescription for an antidepressant if necessary. *Id.*

In his decision, the ALJ addressed Dr. Pillai's January 29, 2014 opinion letter, explaining that he attributed it only "little weight," because it was "unacceptably vague" as Dr. Pillai did not identify what Plaintiff's "cognitive difficulties" were or the degree to which he believed that these difficulties would impact Plaintiff's abilities to perform specific mental work functions. Tr. at 26. The ALJ also found that Dr. Pillai's opinion was inconsistent with the record as a whole and it was repudiated by Dr. Pillai's own statements later in his treatment notes that he could not support Plaintiff's application for social security "at this time" because Plaintiff failed to give a full effort during her subsequent neuropsychological evaluation with Dr. Wadeson. *Id.*, citing Tr. at 359.

Dr. Wadeson had conducted a neuropsychological evaluation of Plaintiff on April 25, 2014 and discussed the prior May 29, 2013 neuropsychological evaluation in his report, which showed that Plaintiff had weaker performance in a number of areas, including memory tasks and executive function, since her last evaluation in 2005 following her temporal lobectomy. *Id.* at 353. Dr.

-10-

Wadeson indicated that the prior report stated that the etiology of the changes was unclear, although it was suggested that psychological factors were playing a role. *Id.*

In his own evaluation, Dr. Wadeson noted Plaintiff's slow speech and mild word-finding issues and her reluctance to guess the answers to some of her questions. Tr. at 355. Dr. Wadeson found that Plaintiff's effort level at testing was variable and inconsistent as she performed below the level of those with known neurological impairments, which called into question the validity of her performance on all of the measures of testing. *Id.* However, Dr. Wadeson further noted that Plaintiff under-reported her symptoms on her self-report. *Id.* Based upon her pattern of performance, Dr. Wadeson concluded that it was impossible to interpret the evaluation results. *Id.* She indicated that given Plaintiff's history of temporal lobectomy and thrombosis, "it is quite likely that she would have some residual cognitive deficits. However, give[sic] her current performance, the true severity and nature of her cognitive deficits is not known/cannot be determined on the basis of this evaluation. These results are simply invalid." *Id.* Dr. Wadeson went on to state that,

> The reasons for which Ms. Laux may have had this type of performance can only be hypothesized. Some individuals with this pattern of performance have developed a secondary emotional reaction in response to their medical condition and then coping with the ongoing changes in their life. This may have caused Ms. Laux to be experiencing more significant emotional distress than she is even fully aware of. However, I doubt that depression is the sole underlying cause of her current presentation as she is denying depression and indicated that her mood has improved since her last evaluation. It is also possible that Ms. Laux may be intentionally producing or exaggerating her symptoms in order to obtain some form of primary or secondary gain. However, determining the reasons for Ms. Laux's performance is complex and must be based on the consideration of multiple factors.

*Id.* at 355-356. She recommended that Plaintiff not repeat the evaluation in the near future because of the current results and the fact that Plaintiff was last evaluated less than one year ago. *Id.* at 356.

Dr. Pillai referred Plaintiff for another neuropsychological evaluation, which was conducted on January 29, 2015 with Dr. Bonner-Jackson. Tr. at 447. However, Dr. Bonner-Jackson reported that the findings of his evaluation were invalid because Plaintiff at first showed poor initiative and lacked confidence in her responses, and then provided inconsistent and at times non-credible effort, quitting on various measures, resisting guessing on some of the measures, and at times falling far below expectations of those who are consistently attending to tasks. *Id.* at 449. He indicated that:

-11-

> There are various potential contributors to Ms. Laux's presentation in this exam, although psychological factors should be considered as a possible etiology. As such, I support her plan to establish care with a counselor who may assist her with adjustment to her memory difficulties. It is notable that she performed normally in some aspects of the exam (e.g., visuospatial skills, verbal fluency, psychomotor speed), suggesting that she retains some intact cognitive abilities. Additionally, I cannot exclude the possibility that she has some degree of genuine cognitive dysfunction, particularly given her history of seizure and temporal lobectomy. However, based on her presentation in this exam, the exact nature and severity of her cognitive impairment is currently unable to be determined. Repeat neuropsychological evaluation is not recommended at this time.

*Id.* at 450.

Again, keeping in mind the standard of review, the Court finds that the ALJ properly applied the treating physician rule and substantial evidence supports his decision to attribute less than controlling weight and the little weight that he gave to Dr. Pillai's opinion. The ALJ sufficiently articulated his reasons for affording less than controlling weight to Dr. Pillai's opinion. He explained that Dr. Pillai failed to identify in his opinion what Plaintiff's "cognitive difficulties" were and Dr. Pillai failed to indicate the degree to which these "cognitive difficulties" would impact her ability to perform specific mental work-related functions. Tr. at 26. The ALJ is correct that Dr. Pillai did not identify Plaintiff's cognitive difficulties or the degree to which they would impact her abilities to perform mental work-related functions. *Id.* at 254. He merely wrote "cognitive difficulties" without any further elaboration or explanation. Without a valid neuropsychological evaluation, Dr. Pillai was not able to provide any further identification or explanation as to the cognitive difficulties that Plaintiff was experiencing. Thus, the ALJ properly articulated his basis for affording less than controlling weight to Dr. Pillai's opinion and for attributing it only little weight.

The ALJ also indicated that Dr. Pillai's opinion was inconsistent with the record as a whole and with Dr. Pillai's May 7, 2014 own treatment record in which it was noted that he would not support Plaintiff's application for social security benefits because of the invalid neuropsychological testing. Tr. at 26. As found by the ALJ, Dr. Pillai's January 29, 2014 opinion is contradictory to the May 7, 2014 follow-up treatment note written by his Physician Assistant ("PA"), Ms. Loughrin. PA Loughrin noted that she and Dr. Pillai discussed the invalid results of Plaintiff's most recent neuropsychological testing and Plaintiff became very upset and indicated that she was treated poorly

-12-

at the test and she became so upset that she gave up during the exam. *Id*. at 358. PA Loughrin indicated that she explained to Plaintiff that "we cannot support SSDI at this time. Our recommendation is that she repeat the Neuropsych testing in 9 months (this was our neuropsychologist's recommendation to discount learning and effects on repeated testing) for an objective evaluation to document severity of cognitive defects(sic). If she needs to pursue SSDI prior to that time, then she needs to go through her epilepsy physicians." *Id*. at 359.

In addition, the ALJ cited to medical evidence showing normal neurological evaluations, such as that conducted by Dr. Schaefer on January 7, 2014, where she found that Plaintiff was alert and oriented, had a normal examination, and had fluent speech. Tr. at 23, citing Tr. at 266. The ALJ also cited to Dr. Pillai's treatment notes from January 29, 2014, the same day that he issued the disability letter, where he diagnosed a cognitive impairment status post temporal lobectomy "with recent worsening possibly due to multiple factors (sleep, stress, psychological factors)" and recommended conservative measures, such as good sleep hygiene, cognitive exercises, physical exercise, yoga, learning a new skill and a prescription for antidepressants if necessary. *Id.* at 23, citing Tr. at 274. The ALJ further cited to Dr. Tesar's treatment notes from December 29, 2013 indicating that while Plaintiff described ongoing memory issues and confusion, his examination indicated that she had fluent language, good insight and judgment, and a diagnosis of major depression, single issue secondary to sinus venous thrombosis that was in remission, and a mild cognitive impairment. Tr. at 23, citing Tr. at 282. He also cited to a psychological evaluation conducted by Dr. Sacco on February 26, 2015 at the Cleveland Clinic in which he indicated that Plaintiff's cognition was grossly intact and diagnosed her with depression and cognitive disorder not otherwise specified. *Id*. at 461. He further noted that "[w]hile the etiology of her difficulties is difficult to ascertain, it is quite clear that the degree of difficulties she describes do not tend to correlate with the evidence presented by the medical teams." *Id*. He recommended further assessment and rated Plaintiff's GAF at 60, indicative of moderate symptoms. *Id.* The ALJ cited to a second assessment by Dr. Sacco on February March 26, 2015 in which he evaluated her and administered the Minnesota Multiphasic Personality Inventory-2-RF ("MMPI-2RF"). *Id*. at 24, citing Tr. at 464. Dr. Sacco indicated that the validity scales of MMPI-2RF showed that Plaintiff

-13-

was possibly over-reporting her memory complaints and scores otherwise indicated somatic complaints as to her neurological symptoms, cognitive complaints as to her memory and concentration, and emotional dysfunction as to depression, stress and worry. *Id.* As to the over-reporting, the MMPI-2RF indicated that Plaintiff provided "an unusual combination of responses that is associated with non-credible memory complaints. This combination of responses may occur in individuals with substantial emotional dysfunction who report credible symptoms, and could also reflect exaggeration." *Id.* at 465. He diagnosed Plaintiff with mood disorder and depressive disorder, not otherwise specified, and rule out somatoform disorder, conversion disorder, and obsessive-compulsive disorder. *Id*. Based upon the test results and his interview, Dr. Sacco concluded that "the nature of the patients[sic] cognitive complaints are at least as likely as not to be explained by psychological/emotional factors as medical factors." *Id*. at 466. He assessed Plaintiff's GAF at 60, indicative of moderate symptoms. *Id.*

And finally, the ALJ cited to primary care physician notes from 2015 which reported that Plaintiff had a normal memory, a normal neurological examination, and no word-finding problems. Tr. at 24, citing Tr. at 397, 401, 502 (Dr. Ashraf's April 7, 2015, May 7, 2015 and September 4, 2015 treatment notes indicating that Plaintiff had an intact memory), 510 (Dr. Schaefer's November 10, 2015 treatment note indicating normal neurologic examination and that Plaintiff had not followed up with providers relating to "depression, stress, headaches, cognitive impairment").

Upon review of the ALJ's decision and the evidence of record, the Court finds that the ALJ properly applied the treating physician rule to Dr. Pillai's opinion. The Court further finds that while Plaintiff may have been experiencing cognitive difficulties due to her cortical resection, her psychological status, lifestyle factors, or some combination of all of these, the lack of valid neuropsychological test results identifying and elaborating on the cognitive difficulties, Dr. Pillai's vague January 29, 2014 opinion, and his subsequent note not supporting Plaintiff's disability application, constitute substantial evidence to support the ALJ's decision affording less than controlling weight and only little weight to Dr. Pillai's opinion.

Plaintiff also challenges the weight that the ALJ attributed to to the medical source statement of Dr. Tesar, her treating psychiatrist. ECF Dkt. #15 at 17-19. Dr. Tesar completed a medical

-14-

source statement form on January 26, 2016 concerning Plaintiff's mental capacity. Tr. at 527. He opined that Plaintiff could rarely: follow work rules; maintain attention and concentration for extended periods of 2 hour segments; respond appropriately to changes in routine settings; deal with the public; relate to co-workers; interact with supervisors; function independently without redirection; work in coordination with or proximity to others without being distracted; working in coordination with or proximity to others without being distracting; deal with work stress; complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; understand, remember and carry out complex job instructions or detailed, but not complex job instructions; behave in an emotionally stable manner; relate predictably in social situations; manage funds/schedules; or leave home on her own. *Id.* at 527-528. Dr. Tesar opined that Plaintiff could occasionally: use judgment; maintain regular attention and be punctual within customary tolerances; understand, remember and carry out simple job instructions; maintain her appearance; and socialize. *Id*. When asked to identify the diagnosis and symptoms that supported his assessment, Dr. Tesar wrote: "cognitive impairment." *Id*. at 528.

The Court finds that the ALJ properly applied the treating physician rule, provided good reasons for attributing less than controlling weight to Dr. Tesar's opinion, and substantial evidence supports his decision to give little weight to the opinion. The ALJ addressed Dr. Tesar's medical source statement in his decision and explained that it was inconsistent with the entirety of the evidence, including the observations of Plaintiff's treating physicians, who found that she had a normal affect and behavior and an intact memory. Tr. at 26, citing Tr. at 271-272, 280-281, 310, 337, 286, 398, 435-436, 460, 482, 502. The ALJ also explained that Dr. Tesar merely stated that Plaintiff had a "cognitive impairment" on the medical source statement without further explanation or support for his extreme limitations for her. *Id.* The ALJ further indicated that the record contained no reports or examinations of Plaintiff by Dr. Tesar after 2014 and thus no evidence existed showing that Dr. Tesar was familiar with Plaintiff's entire treatment history, including her inconsistent and invalid neuropsychological examinations. *Id.* Dr. Tesar completed the form on

January 26, 2016 and did not complete the portion of the form requesting that he identify how long Plaintiff had been under his care. *Id*. at 532.

Based upon the standard of review, the Court finds that the ALJ adequately considered and addressed Dr. Tesar's medical source statement and sufficiently explained why he afforded it less than controlling weight and only little weight. Substantial evidence supports his determination.

## **VI.** **CONCLUSION**

For the following reasons, the Court AFFIRMS the decision of the ALJ and DISMISSES Plaintiff's complaint in its entirety WITH PREJUDICE.

Date: August 17, 2018        */s/George J. Limbert*
                             GEORGE J. LIMBERT
                             UNITED STATES MAGISTRATE JUDGE